**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

JAMES GRAEF as beneficiary of the James Graef IRA and James Graef Roth IRA; ROCKMILL CAPITAL, LLC; ROCKMILL REALTY, LLC; LOUIS CAROLLA as beneficiary of the Louis Carolla Roth IRA; KATHLEEN GROSSART TAYLOR; and KARI TESKE as Trustee of REIO QRP LLC,

Plaintiffs,

v.

Case No. 3:26-cv-00783

ASPIRE EVENTS LLC; COLLECTIVE EQUITY INC.; THEMED STR CAPITAL FUND, LLC; ANDREW CORDLE; EDDIE WILSON; RETAIL ECOMMERCE VENTURES LLC d/b/a REV HOLDINGS, LLC; TAINO ADRIAN LOPEZ; ALEXANDER FARHANG MEHR; and MAYA ROSE BURKENROAD,

Defendants.
_____________________________________/

**COMPLAINT**

COME NOW James Graef as beneficiary of the James Graef IRA and James Graef Roth IRA; Rockmill Capital, LLC; Rockmill Realty, LLC; Louis Carolla as beneficiary of the Louis Carolla Roth IRA; Kathleen Grossart Taylor; and Kari Teske, as Trustee of REIO QRP LLC (the "Ohio Norada Plaintiffs"), by and through their

attorneys, Law Offices of Robert V. Cornish, Jr., P.C., and for their Complaint state and allege as follows:

**PRELIMINARY STATEMENT**

1. Plaintiffs' claims are brought against Florida-based recipients and deployers of investor proceeds from a fraudulent investment Ponzi scheme and against the recipients' principals. The defendants include Aspire Events LLC ("Aspire"), Collective Equity Inc. ("Collective Equity"), Themed Str Capital Fund, LLC ("Themed Str"), Andrew Cordle ("Cordle"), Eddie Wilson ("Wilson"), Retail Ecommerce Ventures LLC d/b/a REV Holdings, LLC ("REV"), and REV's principals Taino Adrian Lopez ("Lopez"), Alexander Farhang Mehr ("Mehr"), and Maya Rose Burkenroad ("Burkenroad") (collectively, "Defendants").

2. Aspire Events LLC, Collective Equity Inc., Andrew Cordle, and Eddie Wilson are collectively referred to herein as the "Aspire Defendants."

3. REV Holdings, LLC, Taino Adrian Lopez, Alexander Farhang Mehr, and Maya Rose Burkenroad are collectively referred to herein as the "REV Defendants."

4. This action arises from the downstream transfer, concealment, deployment, and retention of investor proceeds derived from an unlawful and fraudulent promissory note offering operated through non-party Norada Capital Management, LLC ("Norada Capital") and its related entities (collectively, the "Norada Enterprise"). The Norada Enterprise was controlled and directed by Marco G. Santarelli ("Santarelli"), Ronald Fossum Jr. ("Fossum"), and Michael Johnson

("Johnson") (collectively, the "Norada Control Persons").

5. During the relevant period, the Norada Enterprise maintained primary operating and investor deposit accounts at Wells Fargo Bank, N.A., through which investor funds were received, commingled, and disbursed to affiliated entities and downstream ventures.

6. Upon information and belief, Norada Enterprise entities—including, without limitation, Norada Capital, Norada Equity, LLC, Norada Real Estate Funding, LLC, Norada Ecommerce, LLC, Norada Crypto, LLC, Norada Capital Real Estate Fund I, LLC, Norada Fund Management LLC, Norada Equity Inc., Norada Theatrical Productions LLC, and other affiliated Norada entities under common control of the Norada Control Persons (collectively, the "Norada Transferor Entities")—maintained and utilized bank accounts through which investor-derived funds were received, commingled, and transmitted from these accounts to or for the benefit of Defendants.

7. Plaintiffs' belief in these facts are based upon: (i) the SEC's judgment finding Santarelli violated federal securities laws; (ii) Santarelli's guilty plea to wire fraud in *United States v. Santarelli*, No. 8:25-cr-00174 (C.D. Cal.); (iii) investor communications disseminated by Norada Capital identifying fund allocations to ventures associated with Defendants; (iv) Wilson's statements in a November 17, 2023 webinar confirming Norada Capital's investments in Mastermind entities; and (v) the SEC's complaint in *SEC v. Taino Adrian Lopez, et al.*, No. 1:25-cv-24356 (S.D. Fla.) (the "REV SEC Action").

8. Upon information and belief, the Norada Transferor Entities operated as an integrated fundraising and capital deployment operation in which investor funds were raised through the sale of Notes and then routed through Norada Enterprise-controlled entities and accounts to affiliated ventures and downstream businesses, including those controlled by or benefitting Defendants. The enterprise maintained centralized financial control, commingled investor deposits across multiple accounts, and deployed investor capital without regard to corporate separateness among the Norada entities.

9. This action is a companion to (i) actions pending in the United States District Court for the Central District of California against Santarelli, Fossum, and Johnson, and (ii) actions pending in the United States District Court for the District of Wyoming against Norada corporate entities, each arising from the same Note scheme (respectively the "California Action" and the "Wyoming Action").

10. From approximately January 2020 through August 2024, the Norada Enterprise raised tens of millions of dollars from investors nationwide by offering high-yield, unsecured promissory notes (the "Notes") promising annual returns between 12% and 17% or higher, often accompanied by additional "bonus" inducements of 5%.

11. During this time period, the Norada Transferor Entities repeatedly transferred investor proceeds from Norada Enterprise-controlled bank accounts to ventures associated with Aspire Events, Collective Equity, Themed STR Capital Fund, and related ventures promoted or controlled by Defendants. In the alternative, to the extent funds were not transferred directly to the Aspire Defendants, the Norada

Transferor Entities transferred investor funds directly to REV Holdings and its related entities.

12. In the further alternative, the Aspire Defendants were unjustly enriched through the marketing and promotional benefits they received through Norada Capital's investor-facing activities, including: (a) promotion of Aspire, Money Is, Level Up, and related "Mastermind Businesses" as core portfolio holdings underlying the Notes; (b) appearances by Cordle and Wilson on Norada-sponsored webcasts and investor presentations touting the profit potential of ventures associated with the Aspire Defendants; (c) dissemination of financial metrics and valuations attributed to ventures controlled by the Aspire Defendants; and (d) generation of investor interest and capital inflows benefitting ventures associated with the Aspire Defendants through Norada Capital's promotional activities.

13. Aspire Events functioned as both a recipient of the Norada Enterprise investor proceeds and as a feeder-fund style conduit through which capital was deployed into downstream ventures, including investments into REV and related brand-acquisition entities. The Aspire Defendants therefore served as both a beneficiary and redistributor of investor funds.

14. The ventures associated with Aspire Events, Collective Equity, Themed STR Capital Fund, REV, and related entities were regularly promoted to Norada Enterprise investors, including the Ohio Norada Plaintiffs, as core investment components supporting the promised returns under the Notes, thereby tying the financial success of those ventures directly to the Norada Enterprise's fundraising

activities.

15. In or about June 2024, Wells Fargo terminated its banking relationship with Marco Santarelli, Norada Capital, and the Norada Transferor Entities following extended transactional activity associated with the Norada Note program. Shortly thereafter, the Norada Enterprise shifted its banking relationships to JPMorgan Chase Bank, N.A., through which transfers of investor-derived funds continued.

16. Upon information and belief, the termination of the Norada Enterprise's banking relationship by Wells Fargo and the subsequent migration of the Norada Enterprise's remaining banking operations to JPMorgan Chase constituted a material red flag regarding the legitimacy and sustainability of Norada Capital's fundraising activities. Defendants receiving transfers during this period necessarily interacted with the Norada Enterprise's banking infrastructure in connection with the receipt, clearance, and deployment of those funds.

17. In reality, offerings of the Notes operated as a Ponzi scheme in which investor funds were commingled, diverted, and used to satisfy obligations to earlier investors and to capitalize affiliated ventures rather than to generate legitimate operating returns. As the SEC alleged in *SEC v. Taino Adrian Lopez, et al.*, No. 1:25-cv-24356 (S.D. Fla.) and SEC Litigation Release No. 26413 (the "REV SEC Action"), in order to pay interest, dividends, and maturing note payments to existing investors, REV "resorted to using a combination of loans from outside lenders, merchant cash advances, money raised from new and existing investors, and transfers from other portfolio companies to cover obligations." REV SEC Action Compl. ¶ 48. Further,

"[a]t least $5.9 million of the returns distributed to investors were, in reality, Ponzi payments funded by other investors." *Id.* ¶ 5.

18. Financial summaries and investor communications produced by Norada Capital reflect that a substantial majority of the capital raised through the Note program was deployed into ventures associated with Aspire Events, Collective Equity, and affiliated entities controlled by Defendants. Allocation summaries distributed to investors—including graphical asset allocation materials and pie-chart breakdowns of Norada Capital's purported portfolio—represented that virtually all categories of investments other than scant positions in theatrical ventures and cryptocurrency allocations were directed into businesses associated with the Defendants.

19. Based upon those allocation summaries, the capital directed to ventures associated with Defendants constitutes at minimum the aggregate value of all categories represented as "Mastermind Businesses," "Real Estate Investments," and related venture investments, and at maximum substantially the entirety of investor funds raised through the Note program other than small amounts of funds represented as allocated to theatrical or cryptocurrency investments.

20. Upon information and belief, substantial sums of investor funds were transferred, directly and indirectly, to and through ventures controlled, managed, promoted, or benefitting Defendants, including without limitation Aspire Events LLC, Collective Equity Inc., Themed Str Capital Fund, LLC, and REV Holdings, LLC.

21. Upon information and belief, the ventures associated with Aspire, Collective Equity, and related entities were not capable of generating operating income

sufficient to support their growth or expansion without recurring capital infusions from Norada Enterprise-related sources.

22. Absent the continued inflow of capital from the Norada Enterprise, the ventures associated with Defendants lacked sufficient independent operating revenue to sustain their growth, expansion, or promotional activities at the scale represented to investors.

23. The Transfers were made at a time when each of the entities in the Norada Enterprise lacked sufficient legitimate operating revenue to support its promised returns and was dependent upon continued fundraising to satisfy existing obligations. The Transfers supplied capitalization and operating funding to Defendants while simultaneously depleting assets available to investor-creditors and furthering the continuation and concealment of the scheme.

24. Six of the "E-Commerce Businesses" Norada Capital identified to Plaintiffs—Pier 1; Linens 'n Things; Dressbarn; Stein Mart; Modell's Sporting Goods; and The Franklin Mint—also appear in the SEC's allegations concerning REV's e-commerce roll-up and fundraising. Norada Capital represented these brands as portfolio holdings underlying the Notes, while the SEC alleges REV used these same brands in investor-facing narratives concerning acquisition and monetization strategies. See REV SEC Action Compl. ¶¶ 2, 13-20, 24-29.

25. Likewise, the "Mastermind" businesses of Aspire Events and Collective Equity appear to facilitate multi-level marketing ventures through an affiliated lending entity. Most recently, Aspire Events has become the subject of a class action lawsuit

in Florida for illegal cold-calling and texting of potential customers. See *Doychev v. Aspire Events LLC d/b/a Aspire Tour*, Case No. 552026CA000203A000MX (Fla. Cir. Ct. St. Johns Cty., filed Feb. 5, 2026), annexed hereto as ***Exhibit "A."***

26. And despite any protestations from Aspire Events and Collective Equity that they had nothing to do with Norada Capital's asset gathering efforts, these companies and their officers routinely appeared on webcasts with Santarelli touting the profit potential of "Mastermind" ventures in order to drive investor capital to Norada Capital for deployment. These promotional activities conferred substantial marketing and advertising benefits upon the Aspire Defendants, regardless of whether direct monetary transfers occurred.

27. The recurrence of these specific brands across affiliated capital-raising efforts reflects a shared distressed-brand acquisition narrative used to promote perceived asset backing, investor confidence and supports an inference of shared knowledge, reckless disregard, or willful blindness among Defendants concerning the speculative and unstable nature of the underlying operations.

28. The appearance of these same brands in Norada's investor-facing materials and in the SEC's allegations concerning REV supports a reasonable inference of interconnected capital flows, shared operational ecosystems, and knowledge—or deliberate indifference—regarding the speculative and unstable nature of the underlying operations.

29. Upon information and belief, these overlapping brand narratives were used to reinforce perceived asset backing, inflate enterprise valuations, and legitimize

ongoing capital raises across affiliated entities.

30. The repeated use of identical brand-acquisition narratives across Norada Capital and REV investor solicitations demonstrates a coordinated capital-raising ecosystem in which distressed brand portfolios were used as promotional devices to support continued fundraising.

31. The Ohio Norada Plaintiffs invested $740,000 (SEVEN HUNDRED FORTY THOUSAND) in the Notes. The Notes were marketed as being backed by a diverse pool of profitable companies whose investment returns were touted to outperform the stock market and beat inflation.

32. Upon information and belief, substantial sums—constituting investor proceeds from the Notes—were transferred from Norada Enterprise-controlled accounts without reasonably equivalent value into Florida-based ventures for investment in REV or companies controlled by REV, as well as in ventures of Aspire Events, Collective Equity and Themed Str, each of which were at all relevant times controlled by both Cordle and Wilson. In the alternative, to the extent funds were not transferred to Aspire for onward transfer to REV, the Norada Transferor Entities transferred investor funds directly to REV.

33. On information and belief, Defendants were unjustly enriched by the Ohio Norada Plaintiffs. Defendants knowingly received and retained ill-gotten marketing benefits and/or Norada Enterprise investor proceeds through transfers routed from Norada Enterprise-controlled entities and accounts into Florida-based ventures, including Aspire Events, Collective Equity, and REV.

34. Defendants' receipt and deployment of proceeds from the Notes functioned as a downstream layer of concealment, dissipation, and laundering of investor funds, placing assets beyond the reach of investor-creditors and frustrating recovery.

35. Defendants knowingly received, managed, deployed, or benefitted from these investor funds and involvement with the Norada Enterprise, and substantially assisted the continuation and concealment of the scheme.

36. Plaintiffs seek avoidance of fraudulent transfers, money judgments against transferees, restitution and disgorgement, compensatory and punitive damages as permitted, and equitable relief, including constructive trust, equitable lien, injunctive relief, and appointment of a receiver where warranted.

## DEFINITIONS

37. As used herein, "Notes" refers to promissory notes sold nationwide by Norada Capital—as the investor facing portion of the Norada Enterprise— to investors, including the Ohio Norada Plaintiffs, promising high annual returns, frequently with bonus inducements.

38. As used herein, "Norada Investor Proceeds" refers to funds transmitted by Plaintiffs and other investors to the Norada Enterprise entities for the purchase or holding of Notes.

39. "Transfers" refers to transfers of Norada Investor Proceeds and/or Norada Enterprise-controlled assets from one or more Norada Enterprise entities—including the Norada Transferor Entities—through accounts maintained at Wells

Fargo Bank, N.A. and later JPMorgan Chase Bank, N.A., to or for the direct, indirect, or constructive benefit of Aspire, Collective Equity, Themed Str, Cordle, Wilson, REV, Lopez, Mehr, and/or Burkenroad.

40. As used herein, "REV Scheme" refers to the conduct alleged by the SEC against REV and its principals in the REV SEC Action, annexed hereto as ***Exhibit "B."***

41. As used herein, the "Santarelli SEC Action" refers to the SEC's civil enforcement action concerning Santarelli and related entities and conduct, as pleaded in the SEC complaint and resulting consent judgment referenced herein. See ***Exhibit "C"*** annexed hereto.

**PARTIES**

42. The Ohio Norada Plaintiffs are as follows:

a. Plaintiff James Graef, as beneficiary of the James Graef IRA and James Graef Roth IRA, is an individual residing in Ohio.

b. Plaintiff Rockmill Capital, LLC ("Rockmill Capital") is an Ohio limited liability company with a principal place of business at 1899 Lamb Rd. NW, Carroll, Ohio 43112 and its sole owner Melissa Mears is a resident of Ohio.

c. Plaintiff Rockmill Realty, LLC ("Rockmill Realty") is an Ohio limited liability company with a principal place of business at 1899 Lamb Rd. NW, Carroll, Ohio 43112 and its sole owner Melissa Mears is a resident of Ohio.

d. Plaintiff Louis Carolla, as beneficiary of the Louis Carolla

Roth IRA, is an individual residing in Ohio.

e. Plaintiff Kathleen Grossart Taylor is an individual residing in Milford, Ohio.

f. Plaintiff Kari Teske, the trustee of REIO QRP, LLC, is an individual residing in Dublin, Ohio.

43. Defendant Aspire Events LLC is a Florida limited liability company and maintains a principal place of business at 90 Fort Wade Road, 3rd Floor, Ponte Vedra, Florida 32081. On information and belief, proceeds from the fraudulent sale of the Notes were transferred by the Norada Transferor Entities to Aspire Events. Plaintiffs' belief is based upon: (i) investor allocation materials representing that 55.3% of Norada Capital's assets were invested in "Mastermind Businesses," including Aspire; (ii) Wilson's November 17, 2023 webinar statements confirming Norada Capital's investment in Mastermind entities; and (iii) promotional materials identifying Aspire as a portfolio holding. At all relevant times, Aspire Events LLC was not registered with the United States Securities and Exchange Commission as a broker, dealer, investment adviser, or investment company, nor was it registered with any state securities regulator in connection with the offer or sale of the Notes described herein. Aspire nevertheless participated in the solicitation, promotion, and deployment of investor proceeds derived from the Norada Enterprise's offering of the Notes.

44. On information and belief, Aspire Events invested into REV Holdings, which is currently the subject of SEC litigation as described in the SEC REV Action.

45. Defendant Collective Equity Inc. is a Florida corporation with a principal

address at 90 Fort Wade Road, 3rd Floor, Ponte Vedra, Florida 32081. On information and belief, Collective Equity serves or has served as Aspire's manager and exercised management control over Aspire's operations, business relationship with Santarelli, and deployment of funds. At all relevant times, Collective Equity Inc. was not registered with the United States Securities and Exchange Commission as a broker, dealer, investment adviser, or investment company, nor was it registered with any state securities regulator in connection with the offer or sale of the Notes described herein. Aspire nevertheless participated in the solicitation, promotion, and deployment of investor proceeds derived from the Norada Enterprise's offering of the Notes.

46. Defendant Andrew Cordle resides in Ponte Vedra, Florida. At all relevant times, Cordle served as President and Director of Collective Equity during relevant periods and was publicly represented by Norada as a "Senior Advisor" associated with Norada's promoted Mastermind ventures. Cordle exercised control over Collective Equity and Aspire Events and serves as the control person of those entities under state and federal securities laws.

47. Defendant Eddie Wilson resides in Ponte Vedra Beach, Florida. At all relevant times, Wilson was the Vice President, Treasurer, and Director of Collective Equity, and represented by Santarelli to be a Senior Advisor to Norada Capital. Wilson is a control person of Collective Equity and Aspire Events under state and federal securities laws.

48. Defendant Themed Str Capital Fund, LLC is a Florida limited liability company with a principal address at 7682 W. Irlo Bronson Memorial Highway, Suite

1218, Kissimmee, Florida 34747. On January 24, 2024, Santarelli, on behalf of Themed Str, filed a Form D with the United States Securities and Exchange Commission ("SEC"), pursuant to Rule 506(c) of Regulation D, for a private placement of $50 million dollars. On information and belief, proceeds derived from the fraudulent sale of the Notes were transferred to Themed Str and ultimately delivered to either Aspire Events, REV, or both of them.

49. Defendant REV Holdings, LLC ("REV") is an insolvent Delaware limited liability company with its principal place of business in Florida. Upon information and belief, none of the members of REV Holdings LLC are citizens of Ohio.

50. On December 29, 2023, the assets of REV and the REV Retailer Brands were foreclosed on by a group of secured REV noteholders and the assets were reassigned to a new, unrelated company, Omni Retail Enterprises, LLC. See REV SEC Action Compl. ¶ 12. This foreclosure demonstrates REV's insolvency and the high-risk, non-transparent nature of investments made with Note proceeds.

51. Upon information and belief, REV and its principals offered and sold securities and/or investment contracts to investors on the premise of acquiring, monetizing, and aggregating distressed and legacy e-commerce and retail brands (the "REV Enterprise"), including brands overlapping with the "E-Commerce Businesses" Norada Capital identified to Plaintiffs.

52. Upon information and belief, REV's fundraising materials emphasized acquisition pipelines, distressed-brand turnarounds, and monetization strategies

involving legacy retail and e-commerce brands, including several of the same brands Norada Capital represented as underlying portfolio assets supporting its Note program.

53. Defendant Lopez resides in Rio Grande, Puerto Rico. Lopez was the co-founder, co-owner, and Chief Executive Officer of REV from November 2019 to March 2024. See REV SEC Action Compl. ¶ 9. Lopez also owned, directly or indirectly, minority interests in each of the REV Retailer Brands that issued unsecured notes or equity to investors. On information and belief, Lopez was a co-founder and controlling principal of REV and exercised control over REV's fundraising, representations to investors, and use of investor proceeds.

54. Defendant Mehr resides in San Juan, Puerto Rico. Mehr was the co-founder, co-owner, and President of REV from July 2020 to April 2023. See REV SEC Action Compl. ¶ 10. Mehr also owned, directly or indirectly, minority interest in each of the REV Retailer Brands that issued unsecured notes or equity to investors. On information and belief, Mehr was a co-founder and controlling principal of REV and exercised control over REV's fundraising, representations to investors, and use of investor proceeds.

55. Defendant Burkenroad resides in Swoope, Virginia, and is Lopez's cousin. From 2020 to March 2024, Burkenroad served as President, and later COO, of REV. From 2020 to 2022, Burkenroad served in a management role for two of the REV Retailer Brands, Dress Barn and Pier 1 Imports. See REV SEC Action Compl. ¶ 11. The SEC alleged that Burkenroad's biography on REV's website misrepresented

her experience as having "over 10 years of experience managing multi-million-dollar companies," when in fact "Defendant Burkenroad had no identifiable experience managing any company." REV SEC Action Compl. ¶¶ 57-58.

56. On information and belief, Burkenroad was a principal associated with REV and participated in REV's fundraising and/or investor communications as alleged by the SEC.

57. Each Individual Defendant had the authority to approve or disapprove the acceptance, deployment, and reinvestment of capital received from the Norada Transferor Entities-related sources and exercised direct or indirect control over entity financial decisions.

58. Upon information and belief, none of the members of Aspire Events LLC or Themed Str Capital Fund, LLC is a citizen of Ohio.

**CONTROL AND AGENCY ALLEGATIONS**

59. At all relevant times, the Individual Defendants acted as officers, directors, managers, members, controlling persons, and/or agents of the Entity Defendants and within the course and scope of such agency. Each Individual Defendant had the power to control, and did control, the actions, communications, and financial decisions of the entities with which they were affiliated.

60. Each Entity Defendant acted through its officers, directors, managers, employees, and agents, and is liable for their acts under principles of respondent superior, agency, ratification, and control person liability.

## JURISDICTION AND VENUE

61. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the Securities Act of 1933, 15 U.S.C. §§ 77a et seq., including Sections 12(a)(2) and 15 thereof. Jurisdiction over the federal securities claims is also expressly conferred by 15 U.S.C. §77v(a).

62. This Court also has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because Plaintiffs are citizens of Ohio and Defendants are citizens of Florida, Virginia, and Puerto Rico, and the amount in controversy exceeds $75,000 exclusive of interest and costs. For purposes of diversity jurisdiction, an LLC is a citizen of every state of which its members are citizens. Plaintiffs allege the citizenship of each LLC party as set forth above, and will supplement these allegations upon confirmation of Defendants' LLC member citizenship through jurisdictional discovery if necessary.

63. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. §1367 over Plaintiffs' related state-law claims because those claims arise from the same nucleus of operative facts as the federal securities claims alleged herein.

64. This Court has personal jurisdiction over each Defendant because each Defendant resides in Florida and/or is organized under Florida law and maintains its principal place of business in Florida and/or conducts business in Florida, the Transfers and related wrongful conduct occurred in Florida or were directed to Florida, and because substantial conduct giving rise to this action occurred in Florida.

65. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (b)(2) because one or more Defendants reside in this District for venue purposes and a

substantial part of the events or omissions giving rise to the claims—including receipt, management, and deployment of the Transfers—occurred in this District.

66. Venue is additionally proper in this District pursuant to 15 U.S.C. § 77v(a) because the offers, sales, and inducements of securities described herein were made, in whole or in part, within this District, and because Defendants conducted business within this District in connection with the transactions at issue.

67. Plaintiffs have previously filed the Wyoming Action against the corporate entities in the Norada Enterprise and the California Action against the Norada Control Persons concerning the Norada Enterprise Note scheme.

68. This action is not duplicative of either the Wyoming Action or the California Action. This Complaint asserts completely different claims against different Defendants.

69. Plaintiffs' claims against Defendants are not derivative of the Wyoming or California actions but arise from independent wrongful receipt, deployment, and retention of investor funds and independent statutory violations committed in Florida.

70. Plaintiffs do not seek duplicative recovery. Any recovery obtained in the Wyoming Action or the California Action shall be credited against any recovery obtained herein to the extent required by law. To the extent any overlap exists, Plaintiffs seek complementary, not duplicative, remedies arising from additional defendants not present in the Wyoming Action or the California Action.

## THE NORADA ENTERPRISE

71. Marco Santarelli ("Santarelli") is a felon who resides in Laguna Niguel,

California. Santarelli is a licensed real estate broker in the State of California (License ID #01782514). At all relevant times, Santarelli was a controlling person and the sole managing member, director, and/or officer of Norada Capital Management LLC, a Wyoming limited liability company, and the related corporate entities in the Norada Enterprise including Norada Fund Management, LLC, a Texas limited liability company, Norada Equity Inc., a Wyoming for-profit corporation, Norada Theatrical Productions LLC, a Wyoming limited liability company, and Norada Real Estate Funding LLC, a Wyoming limited liability company.

72. On January 23, 2026, a consent judgment ("SEC Consent Judgment"), annexed hereto as ***Exhibit "C,"*** was filed in *SEC v. Santarelli*, Case No. 8:25-cv-002375-FWD-ADS (C.D. Cal.), ordering, among other things, that Santarelli shall pay disgorgement of ill-gotten gains, prejudgment interest thereon, and a civil penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

73. On or about September 8, 2025, in United States v. Santarelli, No. 8:25-cr-00174-FWS-1 (C.D. Cal.), Santarelli was charged with one count of Wire Fraud substantially related to the allegations in this Complaint. On October 20, 2025, pursuant to a sealed plea agreement, Santarelli pled guilty to this charge. See Docket 8 and Docket 15. The criminal information filed in this matter is annexed hereto as ***Exhibit "D."***

74. Ronald Fossum Jr. ("Fossum") resides in Seattle, Washington. Defendant Fossum was formerly a licensed broker-dealer (CRD #3194203) until SEC

civil and regulatory sanctions including barring him from association with broker-dealers or investment advisers were entered against him on or about December 19, 2017 and June 17, 2018, respectively. At all relevant times, Fossum served as the Chief Financial Officer at Norada Capital and, on information and belief, performed similar roles for the other entities within the Norada Enterprise, using them freely as his alter ego.

75. As a result of Fossum's conviction, the SEC indefinitely barred him from acting as a broker or investment advisor or otherwise associating with firms that sell securities or provide investment advice to the public and from participating in the issuance, purchase, offer, or sale of any security other than for his own personal account. See *Securities and Exchange Commission v. Ronald A. Fossum, Jr. and Alonzo R. Cahoon*, No. 2:17-cv-01894 (W.D. Wash., Filed Dec. 19, 2017).

76. Upon information and belief, the Defendants had knowledge of Fossum's prior conviction and permanent bar by the SEC and were aware this would render him a "bad actor" per the applicable SEC regulations prohibiting Norada Capital from claiming a Regulation D exemption. Plaintiffs' belief is based upon: (i) the public nature of Fossum's SEC bar; (ii) Defendants' sophisticated involvement in securities offerings requiring awareness of regulatory disqualifications; (iii) Fossum's prominent role as CFO in Norada's promotional materials; and (iv) Defendants' receipt of substantial funds from Norada necessitating due diligence into Norada's operations.

77. Cordle and Wilson, as officers and directors of Collective Equity and as

principals associated with Aspire Events, were positioned to know that Norada Capital was soliciting investors using Fossum as CFO and using the Mastermind Businesses as inducements, and that Fossum's barred status posed a material regulatory and disclosure problem for any offering of the Notes. Despite being armed with this knowledge, Cordle and Wilson decided to do business with Santarelli and Norada anyway in a very public manner.

78. Likewise, the REV Defendants were positioned to know that Norada Capital was soliciting investors using Fossum as CFO and using the Mastermind Businesses as inducements, and that Fossum's barred status posed a material regulatory and disclosure problem for any offering of the Notes. Engaging in fraudulent fundraising, misuse of investor funds, and making Ponzi-like payments themselves—as alleged by the SEC in the REV SEC Action—the REV Defendants recklessly disregarded acting upon their knowledge of Norada's offering irregularities and accepted investments into REV Holdings from the Norada Entities.

79. Michael Johnson ("Johnson") resides in San Diego, California. Johnson is a licensed real estate agent (License ID #02016863) and is registered under Marco Santarelli's real estate broker license. At all relevant times, Johnson served as the "Senior Investment Counselor" at Norada Capital, received transaction-based compensation derived from his placement and sale of the Notes, and managed Norada Capital's sales staff.

80. Upon information and belief, the Defendants here had knowledge that in 2007, Santarelli's former company, 360 Enterprises d/b/a Norada Real Estate, filed

for bankruptcy in the U.S. Bankruptcy Court, Central District of California. See *In re 360 Enterprises*, Petition Number 8:07-bk-12868-RK.

81. Upon information and belief, the Defendants also had knowledge that in 2008, Santarelli filed for bankruptcy in the U.S. Bankruptcy Court, Central District of California, and had his debts discharged. See *In re Marco Santarelli*, Petition Number 8:08-bk-13931-RK.

82. Upon information and belief, the Defendants also had knowledge that in June 2011, the Pennsylvania Securities Commission issued a Cease-and-Desist Order, finding Santarelli violated Pennsylvania state securities laws by offering unregistered securities to a non-accredited investor and failing to disclose his bankruptcy filing and debt discharge as well as 360 Enterprises d/b/a Norada Real Estate's bankruptcy filing.

83. Upon information and belief, the Defendants also had knowledge that as a result of this conduct in Pennsylvania, on June 13, 2012, the California Department of Corporations also issued a Cease-and-Desist Order against Santarelli, Cash Flow Management, LLC, and Cash Flow Energy Fund, LLC, ordering they refrain from the further offer or sale of securities in California, unless and until qualification was made under California law or unless exempt.

## THE NOTES SCAM

84. The Norada Enterprise utilized numerous marketing materials and channels, including a publicly accessible website, mass-distributed marketing flyers, investor decks, email campaigns, podcasts, video content, and recurring webinars

containing material misrepresentations and omissions to perpetuate its Ponzi scheme through the fraudulent actions described herein.

85. These materials represented, among other things, that the Notes were backed by profitable portfolio assets, that investor principal was protected by diversified business income, that returns were generated from operations rather than new investor money, and that specific portfolio holdings—identified as Mastermind Businesses and monetizing trade names of defunct national chains—were producing the cash flow necessary to service the promised returns.

86. Upon information and belief, the Defendants here had knowledge that the Norada Enterprise was publicly claiming that the investments, which included ventures controlled, managed, or benefitting Defendants here, were stable and high-income opportunities with good capital appreciation potential.

87. Defendants approved, directed, authorized, or caused the dissemination and making of misrepresentations and omissions of material fact by the Norada Enterprise in connection with the offer and sale of the Notes. These misstatements and omissions included representations concerning the safety of the investment, the use of investor proceeds, the existence of profitable underlying business operations, and the expected returns on the Notes.

88. Defendants knew, or were reckless in not knowing, that such statements were false or misleading or omitted material facts necessary to make the statements made not misleading under the circumstances. Defendants nevertheless approved, ratified, or caused such statements and omissions to be disseminated to induce

investors to purchase the Notes.

89. Nor were such businesses capable of generating consistent, audited, verifiable operating income sufficient to sustain the promised double-digit annual returns independent of new investor inflows.

90. These representations were false and misleading when made because the Mastermind Businesses and component investments introduced by REV Holdings did not and could not generate sufficient audited or verifiable operating cash flow to support Norada Capital's promised double-digit returns.

91. As the SEC alleged in the REV SEC Action, despite REV's claims that its portfolio companies were "on fire" and that "cash flow is strong," in reality "while some of the REV Retailer Brands generated revenue, none generated any profits." REV SEC Action Compl. ¶¶ 4-5.

92. In an investor presentation and/or allocation breakdown disseminated by the Norada Enterprise to the Ohio Norada Plaintiffs from at least August 2022 through January 2024 (the "Asset Allocation Materials"), Norada Capital represented to the investors that approximately 55.3% of its holdings classified as real estate investment were in "Mastermind Businesses," including Aspire, Money Is, and Level Up, the securities of which were held by the Norada Enterprise. On information and belief, these component businesses were controlled by Defendant Aspire Events.

93. The Norada Enterprise also represented that its "current holdings underlying the Notes" fell into categories that included "E-Commerce Business."

94. Norada's "E-Commerce Business" list provided to Plaintiffs included at

least the following: Pier 1; Linens 'n Things; Ralph & Russo; Dressbarn; Stein Mart; Roland Mouret; Modell's Sporting Goods; Bodybuilding.com; The Franklin Mint; Farmerscart; and MentorBox.

95. The SEC alleged that REV raised approximately $112 million from investors through offerings in eight "REV Retailer Brands": Brahms, Dress Barn, Franklin Mint, Linens 'N Things, Modell's, Pier 1, RadioShack, and Stein Mart. REV SEC Action Compl. ¶¶ 1-2, 13-20.

96. Defendants possessed non-public access to operational data, financial statements, revenue metrics, and investor communications concerning the ventures they controlled or managed. Because the REV Defendants possessed such knowledge, they also knew that the components of their "E-Commerce Business" were worthless and mere instrumentalities of at least one Ponzi scheme. This access placed them in a position to know that the financial metrics and valuations disseminated by Norada were materially inaccurate or unsupported by audited financial data and that any transfer of money made to REV Holdings from the Norada Entities could not have been for reasonably equivalent value.

97. Despite possessing such information, Defendants failed to correct or disavow the misleading representations and instead permitted Norada to continue using their ventures as inducements to investors.

98. Upon information and belief, Cordle and Wilson, acting through Collective Equity and Aspire, authorized and accepted the Transfers and the corresponding marketing and advertising benefits.

99. Further, upon information and belief, Defendants Collective Equity, Aspire, Cordle, and Wilson transferred some or all of those funds to the REV Enterprise. In the alternative, if no funds were transferred from Aspire to REV, then the Norada Enterprise, through the Norada Transferor Entities, transferred funds directly to REV.

100. Upon information and belief, such transfers were made without meaningful diligence into the source of funds and at a time when red flags concerning Norada's sustainability were evident.

101. In a webinar held on or about November 17, 2023, Wilson confirmed that Norada Capital invested in at least some of the Mastermind entities and Norada Capital owned one-third interest in Money Is. See Norada Real Estate Investments, Mastermind Business with Eddie Wilson, CEO of Aspire (Norada Masterclass Nov.17, 2023), Youtube (Nov. 22, 2023), https://www.youtube.com/watch?v=tT1BzdDbdSc&t=1171s.

102. Wilson's November 2023 Norada Masterclass appearance (hosted by Santarelli) positioned Wilson as CEO of Aspire and discussed Norada's ownership interest in Money Is. Wilson therefore knew that Norada was using investor money to acquire and hold interests in the Mastermind businesses, and that Norada's ability to pay the promised double-digit "interest" depended on continued fundraising rather than operating revenue.

103. In May 2023, the Norada Enterprise distributed to current and prospective investors, including the Ohio Norada Plaintiffs, financial materials

purporting to reflect the assets and financial condition of the Mastermind Businesses and E-Commerce Businesses, including a balance-sheet style presentation claiming total assets backing the Notes of approximately $113.4 million. This amount was essentially the same as what REV Holdings said it had raised for its own ventures.

104. The Norada Enterprise lacked a reasonable basis for these figures and the presentation was materially false and misleading.

105. Upon information and belief, Cordle and Wilson knew, or consciously avoided knowing, that the figures attributed to businesses they controlled or managed were inaccurate, inflated, unsupported by audited financial statements, or otherwise materially misleading. Despite possessing non-public access to the actual financial condition of the Mastermind Businesses, they permitted Norada to use those figures in marketing materials and investor communications designed to induce purchases and prevent redemptions.

106. Defendants Cordle and Wilson, as officers and directors of Collective Equity and as principals associated with Aspire and related Mastermind ventures, possessed non-public operational, financial, and strategic information regarding revenue, membership counts, liabilities, expenses, and profitability. They therefore had actual knowledge, or at minimum were deliberately indifferent to facts demonstrating a high probability, that the Mastermind Businesses did not generate the cash flow necessary to support Norada Capital's promised 12% to 17% annual returns and that the Norada Enterprise's ability to fund Aspire Events and Collective Equity depended upon continued capital inflows from new investors in the Notes, rather than

legitimate operating revenue.

107. The purpose of the false and misleading information communicated by these individuals to then-current and prospective investors in the Notes such as the Ohio Norada Plaintiffs was to suppress potential redemptions so that more assets could be gathered from new and existing investors, while the Norada Enterprise continued on its commitments to transfer investor proceeds to the Defendants.

**TRANSFERS TO NON-NORADA ENTITIES AND DOWNSTREAM CONCEALMENT**

108. On information and belief, proceeds derived from the fraudulent sale of the Notes were transferred out of the Norada Enterprise entities and committed to Aspire Events and/or ventures managed by Collective Equity.

109. In the alternative, if funds were not transferred to Aspire, then Norada transferred funds directly to REV Holdings and its component entities.

110. In the further alternative, even if no direct monetary transfers were made from the Norada Enterprise to Aspire, the Aspire Defendants received substantial benefits in the form of marketing exposure, promotional appearances, and investor-driven interest generated by Norada's investor-facing communications promoting Aspire and the Mastermind Businesses.

111. Upon information and belief, between at least January 2023 and June 2024, one or more Norada Enterprise entities agreed to transmit and did transmit Note proceeds to Florida accounts controlled by Aspire Events and/or Collective Equity, including accounts maintained or administered in Florida. In consideration for these

transfers, Cordle and Wilson were granted privileges to tout and market their ventures. The mutual intent of the relationship was so that the Aspire Defendants would receive and retain benefits of Transfers and direct investments in the form of capitalization, operating funding, and/or management compensation.

112. On information and belief, Collective Equity acted as manager of Aspire Events and facilitated, received, controlled, and/or deployed investor proceeds transferred from the Norada Enterprise.

113. On information and belief, Cordle and Wilson—each held out as senior advisors—benefitted from and/or participated in transactions in which investor funds were directed into ventures associated with them, thereby supporting the offering's continuity and the concealment of insolvency.

114. On information and belief, Aspire Events also invested into REV Holdings, which later became the subject of SEC litigation in the Southern District of Florida, underscoring the high-risk and non-transparent nature of investments made with Note proceeds and the compounding of investor harm through reinvestment into speculative ventures. Norada Capital itself invested in at least two component companies of REV directly. See ***Exhibit "E"*** annexed hereto.

115. The subsequent SEC allegations against REV further demonstrate that any investment of capital into REV compounded investor exposure to high-risk, non-transparent ventures.

116. Upon information and belief, one or more Aspire Defendants transmitted Note proceeds into accounts controlled by the REV Defendants, and the REV

Defendants received, retained, invested, commingled, or otherwise benefitted from such Transfers. The REV Defendants' receipt of such funds, combined with their own SEC-alleged fundraising misconduct, supports an inference that they either knew or were reckless in not knowing that the capital inflows were derived from investor funds raised through materially misleading representations.

117. In the alternative, if funds were not transferred from Aspire to REV, then the Norada Enterprise transferred funds directly to REV. The SEC alleged in the REV SEC Action that REV raised over $230 million from investors during the Relevant Period. REV SEC Action Compl. ¶ 25.

118. Themed Str is a separate venture for which Santarelli filed a Form D in January 2024 for a purported $50 million offering. Upon information and belief, between at least January 2023 and June 2024, one or more Norada Enterprise entities transmitted Note proceeds to Florida accounts controlled by Themed Str, including accounts maintained or administered in Florida, and Themed Str received and retained the benefits of such Transfers in the form of capitalization, operating funding, and/or management compensation.

119. Upon information and belief, funds from the Ohio Norada Plaintiffs were invested in or otherwise used to support Defendants without reasonably equivalent value, because, inter alia, the Norada Enterprise did not receive bona fide services or market-rate consideration for any of the Transfers. Any purported value was illusory, speculative, contingent upon future fundraising success, or grossly disproportionate to the capital transferred. The Transfers eroded and depleted the Norada Enterprise's

liquidity and thus reduced the pool of assets available to satisfy interest payment obligations to the Ohio Norada Plaintiffs and other investors.

120. The Transfers were made by the Norada Transferor Entities, without reasonably equivalent value, at a time when the Norada Enterprise was insolvent or was rendered insolvent by the Transfers, and with the effect and intent of placing assets beyond the reach of creditors, including investors such as Plaintiffs.

121. The specific dates, amounts, and transaction paths of the Transfers are uniquely within Defendants' possession and will be further identified through discovery and forensic accounting.

**THE REV SEC ACTION AND OVERLAPPING "E-COMMERCE" BRANDS**

122. On September 25, 2025, the SEC filed the REV SEC Action in the Southern District of Florida against REV and its principals, alleging a fraudulent security offering and misuse of investor funds. REV SEC Action Compl. ¶¶ 1-8.

123. The SEC's allegations concern REV's fundraising from investors on representations tied to the acquisition and monetization of distressed and legacy retail and e-commerce brands. *Id.* ¶¶ 2, 24-26.

124. The SEC alleges that REV and its principals raised approximately $112 million from hundreds of investors nationwide through the sale of securities and/or investment contracts. *Id.* ¶ 1.

125. The SEC alleges that REV and its principals used investor funds in a manner inconsistent with investor representations and disclosures, including misappropriation, commingling, and diversion to insiders and other uses. *Id.* ¶¶ 5-6,

59-77.

126. The SEC alleges that REV's investor solicitations included claims regarding identified "brands" or business lines that REV purportedly acquired, controlled, or monetized. *Id.* ¶¶ 2, 24-29.

127. The SEC alleges that brands discussed in REV's investor solicitations and/or operational narrative included several brands that Norada Capital separately represented to the Ohio Norada Plaintiffs as Norada "holdings" or "underlying" holdings supporting the Notes.

128. Defendants solicited investor purchases by allowing their ventures to be used as core inducements in Norada Capital's marketing of the Notes.

129. The overlapping brands include at least the following six: Pier 1; Linens 'n Things; Dressbarn; Stein Mart; Modell's Sporting Goods; and The Franklin Mint.

130. The recurrence of these exact brands in Norada's investor-facing materials and in the SEC's allegations concerning REV reflects a coordinated distressed-brand acquisition narrative used to inflate perceived asset backing and legitimize continued capital raises.

131. Norada Capital represented these brands as "holdings underlying the Notes." The SEC separately alleges that REV used these same brands to induce investors through acquisition and monetization representations.

132. The SEC separately alleges that REV used these same brands as part of its acquisition and monetization narrative to induce investors. The recurrence of this brand narrative across entities in three separate fundraising efforts supports a

reasonable inference of interconnected capital flows and shared operational ecosystems designed to inflate asset perception, legitimize continued capital raises, and mask liquidity shortfalls.

133. Upon information and belief, Norada Capital's marketing of these brands as "holdings" and their value as reported by Aspire and REV was used to confer legitimacy, inflate perceived asset backing, and suppress redemption pressure by creating the impression of a diversified, monetizable e-commerce portfolio.

134. Upon information and belief, Aspire's investment into REV placed Aspire in a position where Aspire and its controlling principals would have actual knowledge, or at minimum were deliberately indifferent to whether the "brand portfolio" narratives being used to market REV were real, verifiable, and supported by audited financials and legitimate operations.

135. Upon information and belief, Lopez, Mehr, and Burkenroad exercised control over REV's fundraising representations and operational narratives concerning the acquisition and monetization of distressed retail brands, including brands overlapping with Norada Capital's marketed "holdings." Their roles placed them in a position to know whether capital inflows—directly or indirectly traceable to Norada Investor Proceeds—were being deployed in a manner consistent with investor representations or were instead part of a broader capital-raising ecosystem dependent on continued investor inflows.

136. Upon information and belief, Aspire, Collective Equity, Cordle, and Wilson benefitted from the Norada Enterprise's use of such narratives because Norada

Capital promoted Aspire and its associated ventures as "portfolio" components while Transfers through the Norada Transferor Entities continued to flow to Defendants.

**REV HOLDINGS INSOLVENCY AND COLLAPSE**

137. On December 29, 2023, the assets of REV and the REV Retailer Brands were foreclosed on by a group of secured REV noteholders and the assets were reassigned to a new, unrelated company, Omni Retail Enterprises, LLC. REV SEC Action Compl. ¶ 12.

138. This foreclosure and assignment demonstrate that REV was insolvent prior to and during the period when investor funds were being transferred into REV from the Norada Enterprise and/or through the Aspire Defendants.

139. The SEC alleged that, by at least September 2022, REV "began missing payments en masse" to investors. REV SEC Action Compl. ¶ 75.

140. Despite knowing of REV's financial distress and inability to pay investors, the REV Defendants "continued to promote new offerings by touting the purported success of the REV Retailer Brands." *Id.* ¶ 50.

141. The collapse of REV and the foreclosure on its assets underscores the speculative, high-risk, and non-transparent nature of investments made with Note proceeds and the compounding of investor harm through deployment of funds into ventures that were already failing.

**TIMELINE OF KEY EVENTS**
**(NORADA / SANTARELLI SEC ACTION / REV SEC ACTION)**

142. From at least August 2022 through January 2024, Norada Capital

disseminated marketing publications identifying "Mastermind Businesses" and representing a significant percentage allocation to those businesses.

143. In May 2023, Norada Capital distributed financial materials to investors purporting to describe the assets and financial condition of Mastermind Businesses, including a presentation claiming total assets of approximately $113.4 million.

144. On information and belief, Cordle and Wilson, through their roles with Collective Equity and Aspire, were positioned to know whether financial metrics attributed to ventures they controlled or managed were accurate.

145. On information and belief, Cordle and Wilson knew or consciously avoided knowing that the Mastermind Businesses did not generate cash flow sufficient to support Norada's promised returns.

146. On or about November 17, 2023, Wilson appeared in an investor-facing webinar in which he confirmed Norada Capital's investment in Mastermind entities and represented an ownership interest in at least one such entity.

147. On December 29, 2023, the assets of REV and the REV Retailer Brands were foreclosed on by secured noteholders and reassigned to Omni Retail Enterprises, LLC. REV SEC Action Compl. ¶ 12. This was not disclosed by the Norada Enterprise, including the Norada Control Persons, to the Ohio Norada Plaintiffs.

148. On January 24, 2024, Santarelli filed a Form D on behalf of Themed Str for a purported $50 million offering under Rule 506(c).

149. On June 13, 2024, Santarelli conducted a YouTube webinar discussing the purported continued success of Mastermind Businesses, including Aspire.

150. Only one week later, on June 20, 2024, Santarelli, on behalf of Norada Capital and the rest of the Norada Enterprise, notified investors that Norada Capital would suspend distribution payments and convert Notes into equity or membership interests.

151. After June 20, 2024, and despite Norada Capital's payment suspension and forced conversions, Norada Capital continued soliciting investors to place additional funds into offerings tied to Aspire, including offerings marketed as promising 17% or more returns supported by claimed valuations and membership metrics.

152. Such continued solicitation after suspension of payments demonstrates conscious disregard of investor harm and further evidences coordinated efforts to prolong capital inflows.

153. On information and belief, Aspire and its controlling principals were aware, or were willfully blind to, Norada Capital's payment suspension and forced conversions and the resulting investor harm.

154. On or about September 8, 2025, Santarelli was charged in the Central District of California with wire fraud substantially related to the conduct alleged in Plaintiffs' related actions.

155. On September 25, 2025, the SEC filed the REV SEC Action in the Southern District of Florida alleging REV's fraudulent fundraising and misuse of investor funds.

156. On October 20, 2025, Santarelli pled guilty pursuant to a plea agreement

in the Central District of California case.

157. On January 23, 2026, the SEC filed or entered a consent judgment in the Santarelli SEC Action ordering relief including disgorgement, prejudgment interest, and civil penalties.

158. On February 5, 2026, a class action lawsuit was filed against Aspire Events LLC in St. Johns County, Florida, alleging violations of the Telephone Consumer Protection Act through unlawful telemarketing calls and text messages. See *Doychev v. Aspire Events LLC d/b/a Aspire Tour*, Case No. 552026CA000203A000MX (Fla. Cir. Ct. St. Johns Cty., filed Feb. 5, 2026), ***Exhibit "A."***

**TRANSFERS THROUGH FEEDER-FUNDS**

159. Upon information and belief, Norada Investor Proceeds were transferred out of Norada entities and into Florida accounts controlled by Aspire and/or Collective Equity. Norada Investor Proceeds were transferred directly or indirectly to REV and/or its component entities.

160. Upon information and belief, these Transfers were made by wire transfer and/or ACH between at least January 2023 and June 2024.

161. Upon information and belief, Aspire and Collective Equity received the Transfers as capitalization, operating funding, management compensation, or other financial benefit. In the alternative, to the extent Aspire did not receive direct monetary transfers, Aspire received substantial benefits in the form of marketing exposure and promotional activities conducted by Norada Capital on behalf of Aspire and the Mastermind Businesses.

162. The Aspire Defendants functioned as a capital conduit through which Norada Investor Proceeds, including the funds from the Ohio Norada Plaintiffs, were routed into affiliated ventures, including REV-related activities, thereby serving both as recipients and redistributors of investor funds.

163. On information and belief, Cordle and Wilson, as controlling principals and officers of Collective Equity and associated principals of Aspire, benefitted from the Transfers through equity value, fees, compensation, and operational funding.

164. On information and belief, Aspire directly or indirectly transferred or caused to transfer Investor Proceeds into REV.

165. Aspire's investment into REV placed Aspire and its principals in a gatekeeper position in which Aspire served as an access point for capital inflows to REV from external sources, including from Norada Enterprise-related funds.

166. Defendants ignored multiple glaring indicators of irregularity and financial distress related to the Norada Enterprise and continued accepting capital despite obvious indicia of fraud.

167. A widely recognized "feeder fund" dynamic exists where an intermediary recipient vehicle functions both as a conduit for capital and as a source of legitimacy for an upstream fraudulent scheme. Such entities supply credibility narratives to investors while simultaneously receiving and deploying investor funds raised through the upstream offering and failing to conduct meaningful diligence into the source of funds or the sustainability of promised returns.

168. Plaintiffs allege that Aspire, Collective Equity, REV, and their principals

functioned in this gatekeeper and feeder capacity by accepting substantial Norada Investor Proceeds, including funds from the Ohio Norada Plaintiffs, while allowing Norada Capital to promote Aspire, REV, and related ventures as core portfolio holdings underlying the Notes and thereby reinforcing investor confidence in the Note program.

169. The size, frequency, and institutional routing of the Transfers required interaction with banking institutions and financial intermediaries responsible for processing the transactions. Upon information and belief, Defendants and/or their financial representatives communicated with Norada's banking institutions and financial personnel in connection with the receipt, clearance, and deployment of these Transfers, providing Defendants with knowledge—or at minimum notice—of the source and nature of the funds received.

170. The red flags confronting Defendants included, without limitation: (a) guaranteed double-digit return promises unsupported by audited cash flow; (b) use of Fossum, who was barred by the SEC, as CFO; (c) Santarelli's prior bankruptcies and regulatory history; (d) reliance on new fundraising to sustain payments; (e) inflated or unsupported asset valuations; (f) the abrupt June 20, 2024 suspension of payments and forced conversion of Notes; (g) overlapping brand-acquisition narratives between Norada and REV used to support parallel fundraising efforts; (h) the termination of Norada's banking relationship by Wells Fargo; (i) Norada's migration of banking operations to JPMorgan Chase immediately prior to the collapse of the Note program; and (j) the December 29, 2023 foreclosure on REV's assets by secured noteholders.

171. The termination of Norada's banking relationship by Wells Fargo, followed by the migration of Norada banking operations to JPMorgan Chase, further reinforced the existence of substantial red flags concerning the legitimacy of the underlying investment program.

172. Each of these red flags independently imposed a duty of inquiry; collectively, they made the existence of fraud overwhelmingly probable.

173. Plaintiffs further allege that Aspire and its principals knowingly accepted and deployed capital derived from an upstream fraudulent offering while ignoring the obvious warning signs into REV and/or benefitted from REV-related activity while failing to perform reasonable diligence into REV's brand-portfolio representations, including those overlapping with Norada's own "holdings underlying the Notes."

174. Despite these red flags, Defendants continued accepting, deploying, and benefitting from Transfers.

175. Plaintiffs allege that Defendants' conduct reflects actual knowledge or willful blindness to fraud indicators and a conscious decision to prioritize continued funding and self-interest.

176. Plaintiffs allege that Defendants' conduct mirrors the classic "red flags" dynamic described in feeder-fund litigation, in which gatekeeper recipients face evidence of likely fraud but choose not to disclose it and continue accepting and benefitting from funds. Such conduct constitutes willful blindness and reckless disregard under Florida law and supports a finding of actual knowledge of the fraudulent nature of the upstream scheme.

177. Defendants' conduct went beyond passive receipt and included active reinforcement of the scheme's legitimacy through investor-facing communications, promotional appearances, approval of financial materials, and continued post-collapse fundraising tied to Aspire-related offerings.

**THE NOTES SCAM UNRAVELS**

178. On June 20, 2024, Santarelli on behalf of Norada Capital emailed each of the Ohio Norada Plaintiffs and others stating that Norada Capital would be suspending distribution payments on their Notes and converting their Notes into equity (membership interests) in Norada Capital.

179. The timing of continued solicitations tied to Aspire and related ventures after the June 20, 2024 suspension of payments demonstrates knowledge of insolvency and intent to prolong capital inflows despite known inability to meet existing obligations.

180. Even after the conversion of the Notes into equity, with full knowledge and consent of Cordle and Wilson, the Norada Enterprise continued to solicit Plaintiffs and other Note investors to place additional funds into offerings tied to Aspire, including promissory note and/or membership-interest securities marketed as offering returns of 17% or more, and supported by claimed valuations and membership metrics.

181. The Norada Enterprise, with full knowledge and consent of Cordle and Wilson, promised 17% interest and quarterly interest payments, stating Aspire had roughly 1,900 paying members with a current valuation of $43 million.

182. On information and belief, Aspire Events and/or the other Defendants could not pay any investors 17% interest and that its valuation of $43 million was, is, and continues to be a sham as it was materially inflated and unsupported by verifiable financial data

**THE INVESTMENTS**

183. In justifiable reliance upon the material misrepresentations, omissions, and deceptive statements disseminated by the Norada Enterprise—which were provided by, known by, and approved by Defendants—concerning the safety, profitability, and intended use of investor funds, Plaintiff James Graef, through Horizon Trust FBO James Graef Roth 5874158, purchased a promissory note from Norada Capital on or about September 1, 2023. That Note reflected a principal investment of $100,000.00, bore interest at the rate of seventeen percent (17%) per annum, and carried a four-year maturity date.

184. In justifiable reliance upon the material misrepresentations, omissions, and deceptive statements disseminated by the Norada Enterprise—which were provided by, known by, and approved by Defendants—concerning the safety, profitability, and intended use of investor funds, Plaintiff James Graef, through Horizon Trust FBO James Graef Roth 5875404, purchased a second promissory note from Norada Capital on or about December 1, 2023. That Note reflected a principal investment of $30,000.00, bore interest at the rate of fifteen percent (15%) per annum, and carried a three-year maturity date.

185. In justifiable reliance upon the material misrepresentations, omissions,

and deceptive statements disseminated by the Norada Enterprise—which were provided by, known by, and approved by Defendants—concerning the safety, profitability, and intended use of investor funds, Plaintiff Rockmill Capital purchased a promissory note from Norada Capital on or about November 11, 2023. That Note reflected a principal investment of $150,000.00, bore interest at the rate of fifteen percent (15%) per annum, and carried a three-year maturity date.

186. In justifiable reliance upon the material misrepresentations, omissions, and deceptive statements disseminated by the Norada Enterprise—which were provided by, known by, and approved by Defendants—concerning the safety, profitability, and intended use of investor funds, Plaintiff Rockmill Realty purchased a promissory note from Norada Capital on or about April 23, 2024. That Note reflected a principal investment of $125,000.00, bore interest at the rate of fifteen percent (15%) per annum, carried a three-year maturity date, and provided for a bonus payment equal to five percent (5%) of the remaining principal balance on or before the maturity date.

187. In justifiable reliance upon the material misrepresentations, omissions, and deceptive statements disseminated by the Norada Enterprise—which were provided by, known by, and approved by Defendants—concerning the safety, profitability, and intended use of investor funds, Plaintiff Louis Carolla, as beneficiary of the Louis Carolla IRA, purchased a promissory note from Norada Capital on or about August 1, 2022. That Note reflected a principal investment of $100,000.00, bore interest at the rate of twenty percent (20%) per annum, and carried a four-year maturity

date.

188. In justifiable reliance upon the material misrepresentations, omissions, and deceptive statements disseminated by the Norada Enterprise—which were provided by, known by, and approved by Defendants—concerning the safety, profitability, and intended use of investor funds, Plaintiff Grossart purchased a promissory note from Norada Capital on or about August 31, 2023. That Note reflected a principal investment of $35,000.00, bore interest at the rate of fourteen percent (14%) per annum, and carried a four-year maturity date.

189. Shortly before May 9, 2024, Norada Capital solicited Plaintiff Teske's investment in a promissory note through a 401(k) plan as a purported real estate investment. In connection with that solicitation, Norada Capital represented to Teske's 401(k) plan provider that the Notes constituted real estate investments, when in fact the underlying investments were placed into so-called "Mastermind Businesses," which were not real estate investments.

190. Further, the then-existing conflicts of interest among Santarelli, the Norada Entities, and the component companies receiving investor funds presented irreconcilable conflicts of interest that, if disclosed, would not have permitted the placement of the Note within Teske's 401(k) account.

191. In justifiable reliance upon the material misrepresentations, omissions, and deceptive statements disseminated by the Norada Enterprise—which were provided by, known by, and approved by Defendants—concerning the safety, profitability, and intended use of investor funds, Plaintiff Teske, through the TTEE

Real Estate Investments Options EPSP 401(k), purchased a promissory note from Norada Capital on or about May 9, 2024. That Note reflected a principal investment of $200,000.00, bore interest at the rate of fifteen percent (15%) per annum, carried a three-year maturity date, and provided for a bonus payment equal to five percent (5%) of the remaining principal balance on or before the maturity date.

192. At the time each of the foregoing investments was made, the Norada Enterprise failed to disclose material facts, including, among other things, the commingling of investor funds, the diversion of investor capital into unrelated ventures including ventures affiliated with the Florida Defendants, Norada's dependence on new investor capital to service existing note obligations, and Norada's insolvency or near-insolvency.

193. The Transfers occurred during the same period Plaintiffs' funds were on deposit with Norada and available for diversion.

194. Where investor funds are commingled in common accounts and transferred downstream, Plaintiffs are entitled to rely upon tracing presumptions recognized under Florida law, including the lowest intermediate balance rule, and the burden shifts to transferees to demonstrate that funds received were not derived from investor proceeds.

195. As a direct and proximate result of these misrepresentations and omissions, Plaintiffs sustained losses of principal and promised interest, and the investor funds described above were thereafter transferred, in whole or in substantial part, to entities including Aspire Events LLC, Collective Equity Inc., REV Holdings

LLC, and/or Themed Str Capital Fund, LLC without reasonably equivalent value and while Norada was insolvent or rendered insolvent by such transfers.

196. The precise path, timing, and amount of the Transfers attributable to each Plaintiff's investment are uniquely within Defendants' possession and will be further traced through discovery.

197. The Norada Note program was a fraudulent Ponzi investment scheme in which funds from new investors were used to fund obligations to earlier investors and to finance affiliated ventures. Transfers made in furtherance of a Ponzi scheme are presumptively made with actual intent to hinder, delay, or defraud creditors. See *In re Wiand*, 591 B.R. 898, 909-10 (Bankr. M.D. Fla. 2018).

**FIRST CAUSE OF ACTION**
**ACTUAL FRAUDULENT TRANSFER**
**(Florida Uniform Fraudulent Transfer Act – Fla. Stat. § 726.105(1)(a))**
**(Against All Defendants)**

198. All preceding paragraphs of the Complaint are restated by the Ohio Norada Plaintiffs as if set forth fully herein.

199. This cause of action is pled in the alternative to the extent permitted by law.

200. The Ohio Norada Plaintiffs are creditors of Norada Capital and/or the Norada Enterprise within the meaning of Fla. Stat. § 726.102(4), holding claims that arose before and/or contemporaneously with the Transfers.

201. The Norada Enterprise entities were debtors of the Ohio Norada Plaintiffs because they incurred obligations to Plaintiffs and other investors to repay

principal and pay promised returns.

202. Each Defendant is sued as an initial transferee, subsequent transferee, and/or beneficiary of the Transfers within the meaning of Fla. Stat. § 726.109(2), and is liable to the extent of the value of assets received.

203. Each Defendant exercised dominion and control over the funds received, either directly or through entities under their control, and therefore had the ability to use those funds for its own purposes.

204. Defendants are liable regardless of whether they were initial transferees or subsequent transferees because each exercised dominion and control over the transferred assets and received the economic benefit thereof.

205. On information and belief, substantial investor funds were transferred from Norada-controlled accounts into Aspire Events and/or ventures managed by Collective Equity as well as REV Enterprise accounts. In the alternative, substantial investor funds were transferred directly from Norada to REV and its component entities.

206. Upon information and belief, the Norada Enterprise, as debtor, made the Transfers—defined above—by transferring Note proceeds and/or Norada-controlled assets to or for the benefit of Aspire Events, Collective Equity, Themed Str, Cordle, Wilson, REV, Lopez, Mehr, and Burkenroad.

207. These Transfers occurred during a period when the Norada Enterprise lacked sufficient legitimate income, at a time when the Norada Enterprise, the Aspire Defendants, and the REV Defendants were engaged in a pattern of raising new capital

to satisfy existing obligations, and was insolvent or rendered insolvent by such Transfers.

208. The ventures associated with Aspire Events, Collective Equity, and related entities depended upon capital provided by the Norada Enterprise and repeatedly received transfers from Norada-controlled accounts during the operation of the Note program.

209. Defendants' continued acceptance and deployment of such funds establishes their participation in, and substantial assistance to, the fraudulent scheme.

210. Defendants knowingly provided substantial assistance to the Norada Enterprise by approving, facilitating, or benefiting from the dissemination of the misrepresentations and omissions described herein and by accepting and deploying investor proceeds derived from those misrepresentations.

211. Upon information and belief, the aggregate Transfers to Defendants exceeded several million dollars and included funds contemporaneous with the Ohio Norada Plaintiffs' investments.

212. Based upon Norada Capital's investor allocation materials, the transfers attributable to ventures associated with Defendants represent at minimum the amounts identified in Norada's asset allocation summaries and at maximum the majority of investor capital raised through the program excluding theatrical and cryptocurrency allocations.

213. As the SEC alleged in the REV SEC Action, "Defendants misappropriated approximately $16.1 million in investor funds, which was diverted

for Defendants Lopez's and Mehr's personal use." REV SEC Action Compl. ¶ 6. Lopez misappropriated approximately $12.5 million, and Mehr misappropriated approximately $3.6 million. *Id.* ¶ 76.

214. The Entity Defendants, including Aspire Events, Collective Equity, Themed Str, and REV, received the Transfers and benefitted from the receipt of investor-derived funds by accepting capitalization, operating funding, management compensation, and/or other financial advantages.

215. Collective Equity, as manager of Aspire Events, facilitated or authorized the receipt and deployment of such funds.

216. Upon information and belief, the REV Defendants facilitated or authorized the receipt of funds from the Norada Enterprise directly and/or from the Aspire Defendants.

217. Defendants knew or were reckless in not knowing that Norada Capital's offering lacked legitimate cash-flow support and depended on continued fundraising.

218. Defendants knew or were reckless in not knowing that investor funds were being diverted into REV-related activity.

219. Defendants continued accepting and benefitting from Transfers even as the Norada Enterprise's financial distress became apparent, culminating in the June 20, 2024 payment suspension and forced conversion.

220. The Transfers were made with actual intent to hinder, delay, or defraud creditors, including the Ohio Norada Plaintiffs, as evidenced by numerous badges of fraud enumerated in Fla. Stat. § 726.105(2), including:

(a) insider relationships and affiliated control between transferor and transferee entities;

(b) concealment or nondisclosure of the Transfers to investors;

(c) the Norada Enterprise's insolvency or near-insolvency;

(d) the lack of reasonably equivalent value;

(e) retention of control by insiders;

(f) use of complex entity layering;

(g) transfer of substantially all available investor-derived capital;

(h) continuation of fundraising efforts despite knowledge of insolvency;

(i) the December 29, 2023 foreclosure on REV's assets;

(j) Santarelli's prior bankruptcies and cease-and-desist orders; and

(k) Fossum's SEC bar.

221. The timing of the Transfers during the Norada Enterprise's dependence on new investor funds to meet existing obligations and the effect of placing assets beyond the reach of investor-creditors further evidences fraudulent intent.

222. Upon information and belief, the Transfers described herein included funds commingled in accounts containing investor capital, including the Ohio Norada Plaintiffs' invested principal, and were made during periods when the Norada Enterprise lacked sufficient non-investor revenue to support such Transfers. Accordingly, the Transfers are presumed to be traceable to investor proceeds, and the burden shifts to Defendants to demonstrate otherwise.

223. Upon information and belief, Norada's accounts into which the Ohio Norada Plaintiffs' funds were deposited were commingled with other investor funds and lacked sufficient non-investor revenue to fund the Transfers.

224. These funds transferred downstream are investor-derived and Defendants cannot prove otherwise.

225. The Ohio Norada Plaintiffs, as creditors of Norada Capital and/or the Norada Enterprise, are entitled to avoidance of the Transfers, attachment, injunctive relief, constructive trust, equitable lien, appointment of a receiver where warranted, money judgments against transferees and beneficiaries, or any other remedies under the statute.

226. Plaintiffs seek recovery of the Transfers to the extent necessary to satisfy their unpaid investment principal, contractual interest, and other damages resulting from the scheme.

**SECOND CAUSE OF ACTION**
**CONSTRUCTIVE FRAUDULENT TRANSFER**
**(Fla. Stat. § 726.105(1)(b) and § 726.106)**
**(Against All Defendants)**

227. All preceding paragraphs of the Complaint are restated by the Ohio Norada Plaintiffs as if set forth fully herein.

228. This cause of action is pled in the alternative to the extent permitted by law.

229. The Norada Enterprise received no reasonably equivalent value in exchange for the Transfers, or any purported value was illusory, non-existent, or

grossly disproportionate.

230. At the time of the Transfers, the Norada Enterprise was insolvent, undercapitalized, and/or unable to pay debts as they became due, as reflected by the June 20, 2024 payment suspension and forced conversion.

231. Upon information and belief, the Florida Defendants knew or reasonably should have believed that the Norada Enterprise was insolvent or would become insolvent as a result of the Transfers.

232. The Transfers are voidable.

233. The Ohio Norada Plaintiffs are entitled to avoidance of the Transfers, attachment, injunctive relief, constructive trust, equitable lien, appointment of a receiver where warranted, money judgments against transferees and beneficiaries, or any other remedies under the statute.

**THIRD CAUSE OF ACTION**
**AIDING AND ABETTING FRAUD**
**(Against All Defendants)**

234. The Ohio Norada Plaintiffs incorporate by reference all preceding paragraphs of the Complaint as if set forth fully herein.

235. To the extent required, this cause of action is expressly pled in the alternative.

236. The Norada Enterprise committed fraud, including by making material misrepresentations and omissions to induce Plaintiffs to purchase and hold Notes. The fraudulent statements and omissions described herein were made through specific investor communications, webinars, written materials, and financial presentations

disseminated by the Norada Enterprise and reinforced by Defendants' participation and authorization.

237. The Defendants had actual knowledge, or consciously avoided knowing, that funds received and deployed were derived from unlawful securities activity and investor deception, including knowledge gained through their positions as officers and directors of Collective Equity and of REV, respectively, and their participation in investor-facing communications, receipt of funds disproportionate to services rendered, insider communications, and continued acceptance of funds after red flags were apparent.

238. Defendants had actual knowledge, or at minimum were deliberately indifferent to facts demonstrating Norada's inability to service promised returns without continued fundraising.

239. Defendants knowingly and substantially assisted the Norada Enterprise's fraud, and their conduct was a substantial factor in enabling the continued offer, sale, and retention of the Notes.

240. Defendants substantially assisted the Norada Enterprise's fraud by:

(a) authorizing, receiving, accepting, managing, investing, and retaining Transfers derived from investor funds;

(b) permitting Norada to market and tout Aspire, Mastermind ventures, and overlapping REV brand narratives as portfolio assets supporting promised Note returns;

(c) preparing, approving, or allowing dissemination of financial

metrics and valuation statements used to induce investor purchases and suppress redemptions;

(d) participating in investor-facing webinars and communications reinforcing false impressions of stability and profitability;

(e) continuing to accept and benefit from investor-derived funds after Norada suspended payments and forced conversions on June 20, 2024;

(f) deploying Norada-derived funds into REV-related activity while failing to conduct reasonable diligence and ignoring obvious warning signs consistent with classic feeder-fund “red flag” dynamics; and

(g) failing to disclose to investors material facts concerning insolvency, red flags, or diversion of proceeds despite occupying positions that imposed a duty not to mislead once they chose to speak in investor-facing communications.

241. Defendants’ acceptance and use of investor-derived funds provided critical financial support to ventures promoted by Norada and thereby enabled Norada to continue marketing those ventures as portfolio holdings underlying the Notes. This conduct substantially assisted the continuation and concealment of the fraudulent scheme.

242. Defendants had actual knowledge or were willfully blind to the Norada Enterprise’s fraudulent conduct, including the use of Mastermind Businesses as inducements to investors, the dissemination of inflated or false financial metrics regarding those businesses, and Norada’s inability to service promised returns without

ongoing fundraising.

243. Plaintiffs reasonably relied upon the misrepresentations reinforced by Defendants' participation and association with the touted Mastermind Businesses.

244. Plaintiffs suffered damages as a direct and proximate result of Defendants' substantial assistance.

**FOURTH CAUSE OF ACTION**
**AIDING AND ABETTING FRAUDULENT TRANSFERS**
**(Against All Defendants)**

245. The Ohio Norada Plaintiffs incorporate by reference all preceding paragraphs of the Complaint as if set forth fully herein.

246. To the extent required, this cause of action is expressly pled in the alternative.

247. Defendants knowingly and substantially assisted the Norada Enterprise in transferring assets with the intent to hinder, delay, or defraud creditors.

248. Defendants accepted transfers of investor-derived funds with knowledge of facts demonstrating the fraudulent nature of the Norada scheme and the absence of legitimate consideration for such transfers.

249. By accepting and deploying these funds, Defendants provided substantial assistance to the continuation and concealment of the fraudulent scheme.

250. As a direct and proximate result, Plaintiffs suffered damages in an amount to be proven at trial.

**FIFTH CAUSE OF ACTION**
**CIVIL CONSPIRACY**
**(Against All Defendants)**

251. All preceding paragraphs of the Complaint are restated by the Ohio Norada Plaintiffs as if set forth fully herein.

252. This cause of action is pled in the alternative to the extent permitted by law.

253. The underlying tortious acts supporting this conspiracy claim include, without limitation, fraudulent transfer, aiding and abetting fraud, violations of the Florida Securities Act, and breach of fiduciary duty as alleged herein.

254. Defendants knowingly agreed, expressly or tacitly, and had a meeting of the minds to participate in conduct to accomplish unlawful objectives, including:

(a) facilitating Norada's unlawful securities offering;

(b) concealing material facts including insolvency and diversion of investor funds;

(c) reinforcing misleading portfolio narratives;

(d) transferring proceeds to affiliated ventures to place assets beyond creditor reach; and

(e) continuing fundraising activities tied to Aspire and related ventures after Norada's collapse.

255. Defendants committed overt acts in furtherance of the conspiracy, including permitting Norada to market Aspire as a portfolio asset, accepting and retaining Transfers, allowing dissemination of inflated financial metrics, and

continuing post-June 2024 solicitation tied to Aspire offerings.

256. Plaintiffs were damaged thereby.

**SIXTH CAUSE OF ACTION**
**CIVIL CONSPIRACY TO COMMIT FRAUDULENT TRANSFER**
**(Against All Defendants)**

257. All preceding paragraphs of the Complaint are restated by the Ohio Norada Plaintiffs as if set forth fully herein.

258. This cause of action is pled in the alternative to the extent permitted by law.

259. Defendants knowingly agreed, expressly or tacitly, to participate in a scheme involving the receipt, deployment, and retention of investor-derived funds transferred from the Norada Enterprise.

260. The purpose of this agreement was to enable the continuation of Norada's fundraising activities and to place investor-derived assets beyond the reach of creditors.

261. In furtherance of this agreement, Defendants received and deployed transfers originating from Norada accounts.

262. Plaintiffs were damaged as a result of the conspiracy.

**SEVENTH CAUSE OF ACTION**
**FLORIDA SECURITIES ACT**
**(Fla. Stat. § 517.211 & § 517.301)**
**(Against All Defendants)**

263. All preceding paragraphs of the Complaint are restated by the Ohio Norada Plaintiffs as if set forth fully herein.

264. To the extent required, this cause of action is expressly pled in the alternative.

265. To the extent Aspire Events, Collective Equity, Cordle, Wilson, or Themed Str directly or indirectly participated in the sale, offer, or inducement of securities, they are jointly and severally liable.

266. Defendants are liable under Fla. Stat. § 517.211 because they directly or indirectly participated in, materially aided, and/or induced the offer and sale of the Notes by allowing their ventures to be touted as core portfolio holdings, providing or authorizing the use of financial metrics used to solicit investors, and participating in investor-facing communications intended to induce purchases and prevent redemptions, all for financial gain.

267. Defendants' conduct constituted direct or indirect participation in the offer and sale of securities within the meaning of Fla. Stat. § 517.211 because their actions were a substantial factor in inducing the Ohio Norada Plaintiffs' purchases and retention of the Notes—including through authorization of marketing materials, participation in investor-facing communications, acceptance of investor-derived proceeds, approval of financial representations, reinforcement of narratives concerning Aspire and the brand portfolios—and were motivated, at least in part, by financial gain, including capitalization, management compensation, equity value, and preservation of upstream funding.

268. Cordle participated in and induced the offer and sale of securities by virtue of his role as President and Director of Collective Equity (manager of Aspire),

his status as a promoted "Senior Advisor" to Norada, and, upon information and belief, his authorization and approval of investor-facing materials and/or communications touting Aspire and related ventures as part of Norada's asset base used to solicit investments.

269. Wilson participated in and induced the offer and sale of the Notes by appearing in investor-facing webinars and allowing Aspire and related ventures to be marketed as core portfolio assets supporting the promised Note returns, and by making statements regarding Norada's ownership interests in Mastermind entities intended to reassure investors and induce additional purchases.

270. Cordle and Wilson also made, participated in, and induced the unlawful sales at issue by, among other things, preparing or approving financial materials, assisting in fundraising efforts, and directing the use and transfer of investor funds.

271. Aspire Events, Collective Equity, and Themed Str participated in and induced the unlawful sales by serving as touted portfolio components used to market the Notes, by accepting and retaining investor-derived proceeds, and by providing or allowing the use of financial statements, valuations, and membership metrics that were presented to investors to induce purchases and suppress redemption demands.

272. Defendants' participation and inducement were motivated by financial gain, including the receipt and retention of the Transfers and the benefits of capitalization and operating funding.

273. Plaintiffs seek restitution against Defendants to the extent of the consideration they received or the benefit they obtained from the unlawful

transactions, together with statutory interest and attorneys' fees where permitted.

**EIGHTH CAUSE OF ACTION**
**UNJUST ENRICHMENT**
**(Against All Defendants)**

274. All preceding paragraphs of the Complaint are restated by the Ohio Norada Plaintiffs as if set forth fully herein.

275. To the extent required, this cause of action is expressly pled in the alternative.

276. Through the Transfers described herein and/or through the marketing and promotional benefits conferred by Norada's investor-facing activities, Norada Investor Proceeds—consisting of Plaintiffs' invested principal and other investor funds—and/or substantial promotional value were transmitted, directly or indirectly, to Defendants.

277. In the alternative, even if no direct monetary transfers were made from Norada to the Aspire Defendants, Aspire Events, Collective Equity, Cordle, and Wilson were unjustly enriched by the marketing, promotional, and advertising benefits conferred upon them by Norada's investor-facing activities, including, without limitation:

(a) Norada's promotion of Aspire, Money Is, Level Up, and related Mastermind Businesses as core portfolio holdings underlying the Notes in investor presentations and allocation materials;

(b) appearances by Cordle and Wilson on Norada-sponsored webcasts and investor presentations, including Wilson's November 17, 2023

appearance on the "Norada Masterclass" webinar touting Aspire and Mastermind ventures;

(c) Norada's dissemination of financial metrics, valuations, and membership statistics attributed to Aspire-controlled ventures;

(d) Norada's use of the Aspire Defendants' names, likenesses, and business affiliations in marketing materials to generate investor confidence;

(e) Norada's representation that Cordle and Wilson were "Senior Advisors" to Norada Capital; and

(f) the generation of investor interest, capital inflows, and membership growth benefitting Aspire and related ventures through Norada's promotional activities.

278. Those Transfers, promotional benefits/exposure, and investor lead generation conferred a direct and measurable financial benefit upon Defendants, including without limitation capitalization, operating funding, management fees, equity value, investment proceeds, marketing exposure, lead generation, membership growth, and other financial advantages.

279. Defendants knowingly accepted, retained, and benefitted from those funds and/or promotional benefits.

280. Defendants' receipt and retention of Norada Investor Proceeds and/or promotional benefits occurred during a period in which Norada was insolvent or rendered insolvent by such Transfers, and while Norada lacked sufficient legitimate income to satisfy its obligations to Plaintiffs.

281. The funds and/or promotional benefits received by Defendants were derived from investor capital—i.e., the Ohio Norada Plaintiffs' investments—raised through material misrepresentations, omissions, and unlawful securities activity.

282. Defendants either knew, were willfully blind to, or recklessly disregarded the fact that the funds and/or promotional benefits they received were derived from investor proceeds raised through materially misleading representations and dependent upon continued fundraising to survive.

283. Defendants did not provide reasonably equivalent value in exchange for the Transfers and/or promotional benefits, and any purported consideration was illusory, disproportionate, or insufficient to offset the depletion of Norada's assets and the harm to Plaintiffs.

284. Under principles of equity and good conscience, Defendants should not be permitted to retain funds and/or promotional benefits traceable to investor proceeds while Plaintiffs remain unpaid.

285. It would be inequitable and unjust for Defendants to retain the benefits conferred upon them at Plaintiffs' expense.

286. As a direct and proximate result of Defendants' unjust retention of investor-derived funds and/or promotional benefits, Plaintiffs have suffered damages in an amount to be proven at trial.

287. Plaintiffs are entitled to restitution, disgorgement, constructive trust, equitable lien, and such other equitable relief as the Court deems appropriate to prevent Defendants' unjust enrichment.

## NINTH CAUSE OF ACTION
## MONEY HAD AND RECEIVED
## (Against All Defendants)

288. All preceding paragraphs of the Complaint are restated by the Ohio Norada Plaintiffs as if set forth fully herein.

289. To the extent required, this cause of action is expressly pled in the alternative.

290. Defendants received money belonging in equity and good conscience to Plaintiffs.

291. The money received by Defendants was derived from Norada Investor Proceeds, including the Ohio Norada Plaintiffs' invested principal and other investor funds raised through the unlawful Note offering.

292. Defendants received and retained such funds for their own use and benefit.

293. At the time Defendants received such funds, Norada was insolvent or rendered insolvent by the Transfers and was unable to satisfy its obligations to the Ohio Norada Plaintiffs.

294. Defendants knew, or should have known, that the funds received were derived from investor capital and were not supported by legitimate operating income sufficient to justify the promised returns.

295. Defendants have not returned such funds to Norada or to the Ohio Norada Plaintiffs.

296. Under principles of equity and fairness, Defendants are obligated to

return the money they received that is traceable to the Ohio Norada Plaintiffs' investments.

297. As a direct and proximate result of Defendants' retention of such funds, the Ohio Norada Plaintiffs have been damaged in an amount to be proven at trial.

298. The Ohio Norada Plaintiffs are entitled to judgment for the amount of money had and received by Defendants, together with prejudgment interest and equitable relief as permitted by law.

**TENTH CAUSE OF ACTION**
**CONVERSION**
**(Against All Defendants)**

299. All preceding paragraphs of the Complaint are restated by the Ohio Norada Plaintiffs as if set forth fully herein.

300. To the extent required, this cause of action is expressly pled in the alternative.

301. The investor-derived funds transferred from Norada accounts constituted specific and identifiable funds traceable to investor deposits, including Plaintiffs' investments, and were held in accounts subject to tracing through bank and accounting records.

302. Defendants knowingly exercised dominion and control over those funds by receiving, retaining, and deploying them for their own benefit.

303. Such conduct constitutes conversion under Florida law.

304. Plaintiffs are entitled to recover the value of the converted funds.

## ELEVENTH CAUSE OF ACTION
## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
## (Against All Defendants)

305. All preceding paragraphs of the Complaint are restated by the Ohio Norada Plaintiffs as if set forth fully herein.

306. To the extent required, this cause of action is expressly pled in the alternative.

307. Norada Capital and the Norada Enterprise owed fiduciary duties to Plaintiffs and other Note investors, including duties of honesty, full disclosure, loyalty, good faith, and the duty to use investor funds for their represented purposes.

308. Norada breached those fiduciary duties by, among other things, commingling investor funds, diverting investor proceeds to affiliated ventures, concealing insolvency, misrepresenting portfolio holdings, and operating a scheme dependent upon continued fundraising rather than legitimate operational income.

309. The Norada Enterprise further breached fiduciary duties by failing to disclose material facts concerning the use of investor funds, including Transfers to the Defendants and investments into ventures associated with Aspire and REV.

310. Defendants had actual knowledge of, or were willfully blind to, Norada's breaches of fiduciary duty.

311. Defendants knew or consciously avoided knowing that Norada lacked legitimate cash flow sufficient to support promised returns and that investor funds were being diverted into affiliated ventures, including those controlled, managed, or benefitting Defendants.

312. Defendants were aware of significant red flags, including Norada's reliance on continued fundraising, the use of a barred individual as CFO, inflated financial metrics, the June 20, 2024 suspension of payments, and the forced conversion of Notes into equity.

313. Despite such knowledge, Defendants substantially assisted Norada's breach of fiduciary duty by accepting, managing, investing, deploying, and retaining Transfers derived from investor funds.

314. Defendants further substantially assisted Norada's breach by permitting Norada to market Aspire and related ventures as core portfolio holdings underlying the Notes and by participating in investor-facing communications reinforcing the false appearance of stability and profitability.

315. Defendants' conduct enabled Norada to continue raising investor capital, suppress redemption demands, and prolong the scheme.

316. As a direct and proximate result of Defendants' substantial assistance of Norada's breach of fiduciary duties, the Ohio Norada Plaintiffs suffered damages including loss of principal and promised interest.

317. Defendants are jointly and severally liable for damages resulting from their knowing and substantial assistance of Norada's breaches of fiduciary duty.

**TWELFTH CAUSE OF ACTION**
**VIOLATION OF SECTION 12(a)(2) OF THE SECURITIES ACT OF 1933**
**(15 U.S.C. § 77l(a)(2))**
**(Against All Defendants)**

318. All preceding paragraphs of the Complaint are restated by the Ohio

Norada Plaintiffs as if set forth fully herein.

319. To the extent required, this cause of action is expressly pled in the alternative.

320. The Notes described herein constitute "securities" within the meaning of Section 2(a)(1) of the Securities Act of 1933, 15 U.S.C. § 77b(a)(1).

321. The Ohio Norada Plaintiffs purchased the Notes through interstate commerce, including use of wires, email communications, webinars, and internet-based solicitations.

322. In connection with the offer and sale of the Notes, Defendants made, participated in, or materially aided statements that included untrue statements of material fact and omitted material facts necessary to make statements made not misleading.

323. Such misrepresentations and omissions included, without limitation:

(a) representations that investor returns were supported by diversified operating income;

(b) representations that identified Mastermind Businesses and e-commerce brands constituted stable asset backing;

(c) omissions concerning insolvency, commingling, diversion of proceeds, and dependence on new investor capital;

(d) omissions concerning red flags including regulatory history and barred individuals;

(e) omissions concerning downstream Transfers to affiliated ventures; and

(f) omissions concerning the December 29, 2023 foreclosure on REV's assets.

324. Defendants' participation in investor communications, promotional materials, marketing narratives, solicitation activities, and promotion of their ventures as portfolio components underlying the Notes constituted direct or indirect solicitation and constituted participation in the offer and sale of securities.

325. Defendants directly or indirectly solicited investments in the Notes by permitting their ventures, financial metrics, and operational narratives to be used in investor marketing materials and communications designed to induce investment in the Notes and suppress redemption demands.

326. Defendants were motivated by financial gain because Norada's fundraising directly resulted in capitalization, operating funding, management compensation, equity value, and continued financial support for Defendants' ventures.

327. Defendants were "statutory sellers" within the meaning of Section 12(a)(2) because they directly solicited purchases, were a substantial factor in bringing about the transactions, and were motivated, at least in part, by financial gain, including the receipt of capitalization, management compensation, equity interests, and continued funding.

328. The Ohio Norada Plaintiffs, along with all other investors in the Norada Enterprise, did not know, and in the exercise of reasonable care could not have known,

of the untruths and omissions at the time of purchase.

329. The Ohio Norada Plaintiffs are entitled to rescission and recovery of the consideration paid for the Notes, together with statutory interest, or damages if the securities are no longer owned.

**THIRTEENTH CAUSE OF ACTION**
**CONTROL PERSON LIABILITY**
**(Section 15 of the Securities Act, 15 U.S.C. § 77o)**
**(Against Lopez, Mehr, Burkenroad, Cordle, and Wilson)**

330. All preceding paragraphs of the Complaint are restated by the Ohio Norada Plaintiffs as if set forth fully herein.

331. To the extent required, this cause of action is expressly pled in the alternative.

332. Lopez, Mehr, Burkenroad, Cordle, and Wilson exercised direct or indirect control over entities that violated Section 12(a)(2).

333. Lopez, Mehr, Burkenroad, Cordle, and Wilson each had the power to direct or influence the management, policies, and financial decisions of the entities they controlled and exercised that power in connection with fundraising activities, investor communications, financial reporting, and the deployment of investor funds.

334. Lopez, Mehr, Burkenroad, Cordle, and Wilson are jointly and severally liable for the primary violations described herein unless they can sustain the burden of proving they acted in good faith and did not directly or indirectly induce the violation.

335. Lopez, Mehr, Burkenroad, Cordle, and Wilson possessed the power to prevent or correct the violations alleged herein but failed to do so and instead permitted

the violations to occur.

336. The Ohio Norada Plaintiffs are entitled to recover damages jointly and severally from each controlling person.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants as follows:

1. Avoidance of all fraudulent Transfers pursuant to Fla. Stat. Chapter 726;

2. Entry of money judgment against each Defendant as an initial transferee, subsequent transferee, or beneficiary as described above in an amount equal to the greater of: (a) the value of the Transfers received; or (b) the full amount of the Ohio Norada Plaintiffs' unpaid principal and contractually promised interest, to the extent permitted by law;

3. Rescission and restitution in an amount equal to the full consideration paid by the Ohio Norada Plaintiffs, together with statutory interest from the dates of investment;

4. Compensatory damages including loss of principal, lost interest, consequential damages, and all additional losses proven at trial;

5. Joint and several liability against all Defendants for the full measure of the Ohio Norada Plaintiffs' damages including but not limited to 15 U.S.C. § 77o;

6. Disgorgement of all profits, fees, compensation, equity value, marketing benefits, or other financial benefits received directly or indirectly from Norada Investor Proceeds or Norada's promotional activities;

7. Imposition of constructive trust and/or equitable lien over all assets traceable to the Transfers;

8. Prejudgment interest from the date of each investment and/or date of each Transfer;

9. Punitive damages to the fullest extent permitted under Florida law based on intentional misconduct and conscious disregard of the Ohio Norada Plaintiffs' rights; Defendants had actual knowledge of the wrongfulness of their conduct and the high probability of injury to investors yet deliberately pursued such conduct for financial gain;

10. Permanent injunctive relief and appointment of a receiver where necessary to prevent dissipation of assets;

11. Attorneys' fees and costs pursuant to Fla. Stat. § 517.211 and other applicable provisions; and

12. Such other and further relief as the Court deems just and proper.

Dated: April 7, 2026

Respectfully submitted,

**LAW OFFICES OF ROBERT V. CORNISH, JR., PC**

*/s/ Kaitlin A. Harris*
Kaitlin A. Harris
Florida Bar #1029115
1395 Brickell Avenue, Suite 800
Miami, FL 33131
kharris@rcornishlaw.com
Tel: (305) 735-3450
Fax: (571) 290-6052

*Attorneys for Plaintiffs James Graef as beneficiary of the James Graef IRA and James Graef Roth IRA; Rockmill Capital, LLC; Rockmill Realty, LLC; Louis Carolla as beneficiary of the Louis Carolla Roth IRA; Kathleen Grossart Taylor; and Kari Teske, as Trustee of REIO QRP LLC*